IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

JAMES MCCULLOUCH,

   **Plaintiff,**

             **Civil Action 2:11-cv-977**
  **v.**           **Judge Gregory L. Frost**
             **Magistrate Judge Elizabeth P. Deavers**

MICHAEL J. ASTRUE,
COMMISSIONER OF SOCIAL SECURITY,

   **Defendant.**

## REPORT AND RECOMMENDATION

   Plaintiff, James McCullouch, brings this action under 42 U.S.C. §§ 405(g) and 1383(c)(3) for review of a final decision of the Commissioner of Social Security ("Commissioner") denying his applications for social security disability insurance benefits and supplemental security income. This matter is before the United States Magistrate Judge for a Report and Recommendation on Plaintiff's Statement of Errors, the Commissioner's Memorandum in Opposition, and the administrative record. (ECF Nos. 14, 15 and 11.) For the reasons that follow, it is **RECOMMENDED** that the Court **OVERRULE** Plaintiff's Statement of Errors and **AFFIRM** the Commissioner's decision.

## I. BACKGROUND

   Plaintiff protectively filed his applications for benefits on September 4, 2008 alleging that he has been disabled since February 1, 2006, at age 46. (R. at 8.) Plaintiff alleges disability as a result of a history of bladder cancer, nerve problems in his legs and depression. Plaintiff's

applications were denied initially and upon reconsideration.  Plaintiff sought a *de novo* hearing before an administrative law judge ("ALJ").

The ALJ, John R. Allen, held a hearing on April 14, 2011, at which Plaintiff, represented by counsel, appeared and testified.  (R. at 8.)  A vocational expert also appeared and testified. *Id.*  On May 9, 2011, the ALJ issued a decision finding that Plaintiff is not disabled.  (R. at 23.) The ALJ's decision became final and appealable on September 1, 2011, when the Appeals Council denied Plaintiff's request for review.  (R. at 1-3.)  Plaintiff timely appealed.

## II. HEARING TESTIMONY

### A.      Plaintiff's Testimony

Plaintiff testified at the April 14, 2011 hearing.  (R. at 30-75.)  He stated that he lives with his adult daughter, his wife and his grandson in a three-bedroom house.  (R. at 33.) Although he has a driver's license, Plaintiff testified that he avoids driving because the bouncing around causes him discomfort.  He indicated that he drives approximately one and a half miles per day.

Plaintiff testified that his past work includes driving a dump truck and maintenance.  (R. at 35, 36.)  As a driver Plaintiff would deliver gravel to various job sites.  (R. at 37.)  Upon delivery he would be required to climb into the bed of the truck and shovel the gravel.  *Id.*  He would also perform maintenance on the trucks which required him to bend to "get into tight spaces."  (R. at 38.)  Plaintiff also indicated that he has experienced spray painting automobiles. (R. at 47.)

2

Plaintiff stated that his doctor released him to return to work two months after his May 2005 surgery.  (R. at 40.)  The doctor imposed a single exertional restriction, prohibiting Plaintiff from lifting over thirty pounds.  *Id.*

Plaintiff reported feeling a burning sensation around his abdomen every morning when he wakes up.  (R. at 41.)  Having had surgery to remove his bladder, Plaintiff is required to use a urinary pouch.  He stated that it feels like something inside of him is tearing every time he empties his pouch.  According to Plaintiff, this experience causes tears to run down his face, though he is unsure whether the pain or depression causes the tears.  *Id.*  The burning sensation also returns after Plaintiff does yard work.  (R. at 43.)  Plaintiff testified that he has numbness in his right leg as a result of damage to a nerve that occurred during surgery.  (R. at 50, 51.) Plaintiff stated that he has no energy and does not want to get out of bed anymore.  (R. at 53.) He does not get much sleep because he has to stay on schedule and drain his pouch.  (R. at 54.)

Plaintiff stated that he had been prescribed Zoloft for depression, but he stopped taking it because the side effects were worse than the depression itself.  (R. at 56.)  He stated that he did not want to live while taking the medicine.  *Id.*  He became violent toward his wife and threatening toward his family members.  *Id.*  He further stated that he has good days and bad days since stopping the medication.  (R. at 57.)  He does not go to counseling because he does not have the money or medical insurance.  (R. at 65.)

Plaintiff testified that he runs a catheter through his naval every two to three hours to empty a pouch located inside of his abdomen.  (R. at 43.)  He stated that draining the pouch is very painful to the point it brings tears to his eyes.  (R. at 44.)  It takes approximately fifteen minutes to drain the pouch.  *Id.*

3

In terms of daily activities, Plaintiff testified that he is able to lift his seven-year-old grandson, although it is difficult.  (R. at 40.)  He stated that he can no longer run or wrestle with his grandson.  (R. at 45.)  He can sit for approximately thirty minutes at a time before he will have to start moving around to relieve pain.  (R. at 46.)  Upon standing for fifteen minutes or more Plaintiff reported that his left thigh becomes numb.  *Id.*  He can throw a football with his grandson for approximately fifteen minutes at a time before he has to sit down.  (R. at 45.)  Plaintiff testified that he watches television most of the day.  (R. at 47.)  He also drives his grandson to and from school each day.  (R. at 48.)  Plaintiff stated that he runs the vacuum, does the dishes, and takes out the trash.  (R. at 49.)  He also builds model cars and trucks and plays video games with his grandson.  *Id.*

**B.     The Vocational Expert's Testimony**

Jerry Olsheski, Ph.D. testified at the hearing as a vocational expert ("VE").  (R. at 66.)  Dr. Olsheski characterized Plaintiff's past work experience as a dump truck driver as medium and unskilled.  (R. at 67.)  The ALJ asked the VE whether a hypothetical person limited to a full range of medium work could perform Plaintiff's past jobs if that person required a fifteen minute break every two to three hours.  (R. at 67.)  The VE testified that such a person could perform Plaintiff's past jobs.  *Id.*  Next, the ALJ asked the VE whether a hypothetical person could perform Plaintiff's past jobs if he or she were limited to light work, meaning the individual could lift ten pounds frequently and twenty pounds occasionally, stand and walk for six hours in an eight hour day, and would have the same limitation with regard to a need for breaks.  *Id.*  The VE testified that although those conditions would preclude the individual from performing Plaintiff's past jobs, the individual could perform other light, unskilled jobs.  *Id.*  The VE stated that light,

unskilled jobs are available in the relevant labor market, including positions as a hand packer at the light level; unskilled cleaning jobs; and jobs as a packing and filling machine operator. (R. at 68.) Finally, the VE testified that if the same hypothetical person would need two hours daily during the workday for rest he or she would be precluded from work. (R. at 68.) The VE stated that the examples provided in his responses are consistent with the Dictionary of Occupational Titles. *Id.*

On cross examination by Plaintiff's counsel, the VE testified that if the timing of the individual's breaks fluctuated from day to day, in other words if a the need for breaks did not follow a schedule, that "[c]ould be a problem." (R. at 70.) The VE also acknowledged the potential for a "problem" if the hypothetical person needed additional breaks throughout the workday for medical reasons, or if the person was off-task five to ten minutes per hour due to distraction from pain. (R. at 71-72.)

### III. MEDICAL RECORDS

**A.     Physical Impairments**

**1.     The Ohio State University Medical Center**

Plaintiff presented to the emergency room at The Ohio State University ("OSU") on December 7, 2004 with complaints of difficulty urinating. (R. at 254.) He reported intermittent instances over the previous nine or ten months in which his urine contained blood or a white mucus-like substance. Plaintiff indicated that it is sometimes very difficult for him to empty his bladder. Plaintiff was diagnosed with a urinary tract infection and discharged with instruction to follow-up with the OSU Urology Clinic. (R. at 255.)

5

2.      **Kevin Banks, M.D.**

A March 12, 2005 CT Scan of Plaintiff's abdomen revealed profound abnormality in Plaintiff's bladder.  (R. at 301.)  The radiologist reported a mass indenting at the base of the bladder with a possible second mass adjacent to the left ureterovesical orifice.

Dr. Banks diagnosed Plaintiff with a bladder lesion in March 2005.  (R. at 288.)  The results of a diagnostic test led to a diagnosis of invasive bladder cancer.  (R. at 284.)  On March 25, 2005, Dr. Banks performed a cystourethrocopy, bilateral retrograde pyelography, transurethreal resection of bladder tumor, and a biopsy of the prosthetic urethra.  (R. at 263-64.)

On May 3, 2005, Dr. Banks performed surgery to remove Plaintiff's bladder, prostate gland and urethra.  (R. at 258.)  Dr. Banks also implanted a urinary diversion pouch in Plaintiff's abdomen.  Plaintiff tolerated the procedure well and was discharged seven days later "in excellent condition."  *Id.*

Plaintiff underwent a CT scan of the abdomen and pelvis on December 12, 2005.  (R. at 300.)  The scan revealed no evidence of recurrent cancer cells.

3.      **Robert C. Woskobnick, D.O.**

Dr. Woskobnick examined Plaintiff on December 4, 2008 at the request of the Bureau of Disability Determination.  (R. at 319-21.)  Plaintiff related a history of stage two bladder cancer with bladder removal, prostate removal, and urethral removal in 2005.  (R. at 319.)  Plaintiff reported that he has a urinary pouch that he empties every two to three hours by way of a catheter through his naval.  Plaintiff also indicated that he has nerve problems in his right leg as a result of the extensive surgery.  He stated that his urologist instructed him to not lift greater than thirty pounds.  Plaintiff reported that because he cannot afford prescription pain medicine

he self-medicates with marijuana to control the pain.  Dr. Woskobnick reported that Plaintiff has

not followed-up with the urologist or oncologist.  (R. at 320.)  He further reported:

> [Plaintiff]  has no insurance, benefits or     ability  to work at this tim   e  to obtain
> money  so he can go follow up with the           urologist  or oncologist.  He would
> certainly benefit from  urology or oncol ogy  follow up.  I did recom mend that the
> claimant go to the emergency room to see if he could obtain a catheter so he could
> drain his abdomen.  Also he was recommended to possibly seek out catheter at the
> fire department.

(R. at 321.)

**4.     Linda Hall, M.D.**

On January 16, 2009, Dr. Hall reported that although Plaintiff states he has nerve damage

in his legs, his most recent physical examination showed normal range of motion and no

abnormal findings in the extremities.  (R. at 336.)  She noted that Plaintiff requires self-

catheterization every two to three hours, but she indicated that he could perform the

catheterization during normal work breaks.  In light of Plaintiff's urinary diversion pouch, Dr.

Hall opined that it would be reasonable for Plaintiff to avoid heavy lifting.  *Id.*

Anton Freihofner, M.D. reviewed Plaintiff's records and affirmed Dr. Hall's findings on

April 1, 2009.  (R. at 340.)

**B.     Mental Impairments**

**1.     Mark D. Hammerly, Ph.D.**

Dr. Hammerly evaluated Plaintiff at the request of the Bureau of Disability

Determination on December 2, 2008.  (R. at 311.)  Plaintiff denied ever being suicidal or being

hospitalized or institutionalized for self-injurious behavior.  (R. at 312.)  Plaintiff admitted to

using marijuana regularly to help with pain.  (R. at 312-13.)  Plaintiff was cooperative with a

7

downcast mood and constricted affect.  (R. at 313.)  He expressed feelings of hopelessness, helplessness, and worthlessness.  Dr. Hammerly reported that, overall, Plaintiff "related in a businesslike and clam manner; however, he also seemed demoralized at times."  *Id.*  Plaintiff also demonstrated signs of anxiety.

In terms of activities of daily living, Plaintiff reported that he goes to bed around 12:00 a.m. and wakes up between 3:00 a.m. and 4:00 a.m.  (R. at 315.)  He described problems sleeping due to pain and pressure on his abdomen.  Plaintiff stated that when he wakes up, he empties his bag and then watches television.  He also works on his truck, cuts the grass, "runs the dogs," and does welding for a friend.  *Id.*  Plaintiff indicated that he wrestles and plays games with his grandson in the afternoons.  He also reported that he and his wife share the responsibility of managing the household finances and paying the bills, and that he drives himself to appointments.  Plaintiff stated that he helps with household chores, including dishes, laundry, cooking, housecleaning, and grocery shopping.

Dr. Hammerly diagnosed Plaintiff with major depression, recurrent, moderate.  He assigned a GAF score of 55.[1]  (R. at 316.)  Dr. Hammerly reported that Plaintiff is mildly impaired in his ability to relate to others and moderately impaired in his ability to maintain attention, concentration, persistence, and pace, as well as his ability to withstand the stress and pressures associated with day-to-day work activity.  (R. at 316, 317.)

---

[1] The GAF scale is used to report a clinician's judgment of an individual's overall level of functioning.  Clinicians select a specific GAF score within the ten-point range by evaluating whether the individual is functioning at the higher or lower end of the range.  A GAF score of 51-60 is indicative of "Moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)."  *See* American Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders 32–34 (American Psychiatric Association, 4th ed. text rev. 2000) (DSM-IV-TR).

## 2. David Demuth, M.D.

On December 19, 2008, state agency reviewing physician Dr. Demuth reviewed Plaintiff's medical records.  (R. at 326-330.)  Dr. Demuth concluded that Plaintiff is not significantly limited except in his ability to complete a normal workday and workweek without interruptions from psychologically based symptoms.  (R. at 327.)  Dr. Demuth determined that Plaintiff has a reduced tolerance for stress, and that he can carry out tasks in situations where duties are relatively static and changes can be explained.  (R. at 328.)  Dr. Demuth further concluded that Plaintiff can complete tasks that do not require independent prioritization or more than daily planning.  *Id.*

Roy Shapiro, Ph.D. reviewed Plaintiff's medical records and affirmed Dr. Demuth's findings on February 27, 2009.  (R. at 339.)

## IV. THE ADMINISTRATIVE DECISION

The ALJ issued his decision on May 9, 2011.  (R. at 8-23.)  At step one of the sequential evaluation process,[2] the ALJ found that Plaintiff had not performed substantially

---

[2]Social Security Regulations require ALJs to resolve a disability claim through a five-step sequential evaluation of the evidence.  *See* 20 C.F.R. §404.1520(a)(4).  Although a dispositive finding at any step terminates the ALJ's review, see *Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007), if fully considered, the sequential review considers and answers five questions:

1. Is the claimant engaged in substantial gainful activity?
2. Does the claimant suffer from one or more severe impairments?
3. Do the claimant's severe impairments, alone or in combination, meet or equal the criteria of an impairment set forth in the Commissioner's Listing of Impairments, 20 C.F.R. Subpart P, Appendix 1?
4. Considering the claimant's residual functional capacity, can the claimant perform his or her past relevant work?
5. Considering the claimant's age, education, past work experience, and residual functional capacity, can the claimant perform other work available in the national economy?

gainful activity since February 1, 2006.  The ALJ found that Plaintiff has the following severe impairments: a history of bladder cancer status post implantation of prosthetic urethra and a depressive disorder.  (R. at 10.)  He further found that Plaintiff does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments.  (R. at 11.)  In reaching this conclusion, the ALJ specifically considered whether Plaintiff's history of invasive bladder cancer meets or equals the criteria of Listing 13.22.  *Id.*  He also considered whether Plaintiff's depressive disorder meets or equals the B or C criteria of Listing 12.04.  *Id.*

At step four of the sequential process, the ALJ evaluated Plaintiff's residual functional capacity ("RFC").  The ALJ concluded that Plaintiff has the RFC to perform light exertional work[3] subject to the following conditions: he is able to lift and carry up to twenty pounds occasionally and up to ten pounds frequently; he is able to sit, stand and walk for up to six hours in an eight-hour workday; and mentally he is limited to unskilled work and unable to perform fast paced or high production tasks.  (R. at 15.)

Finally, relying on the VE's testimony, the ALJ determined that Plaintiff is not capable of performing his past relevant work.  (R. at 20-21.)  The ALJ further concluded that Plaintiff could perform other jobs at the light exertional level, and that a significant number of such jobs exist in the relevant area.  (R. at 22.)   He therefore concluded that Plaintiff is not disabled within the meaning of the Social Security Act.  (R. at 23.)

## V. STANDARD OF REVIEW

---

*See* 20 C.F.R. §404.1520(a)(4); *see also Henley v. Astrue*, 573 F.3d 263, 264 (6th Cir. 2009); *Foster v. Halter*, 279 F.3d 348, 354 (6th Cir. 2001).

[3]The Regulations define light work as involving the ability to lift " no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds . . . ." 20 C.F.R. § 404.1567(b).

Upon review of a case appealing the decision of the Commissioner, the Court "must affirm the Commissioner's decision if it 'is supported by substantial evidence and was made pursuant to proper legal standards.'" *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 651 (6th Cir. 2009) (quoting *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007)); *see also* 42 U.S.C. § 405(g) ("[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . ."). Under this standard, "substantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers*, 486 F.3d at 241 (quoting *Cutlip v. Sec'y of Health & Human Services*, 25 F.3d 284, 286 (6th Cir. 1994)).

Although the substantial evidence standard is deferential, it is not trivial. The Court must "'take into account whatever in the record fairly detracts from [the] weight'" of the Commissioner's decision. *TNS, Inc. v. NLRB*, 296 F.3d 384, 395 (6th Cir. 2002) (quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487 (1951)). Nevertheless, "if substantial evidence supports the ALJ's decision, this Court defers to that finding 'even if there is substantial evidence in the record that would have supported an opposite conclusion.'" *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (quoting *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)).

Finally, even if the ALJ's decision meets the substantial evidence standard, "'a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'" *Rabbers*, 582 F.3d at 651 (quoting *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir.

11

2007)).

## VI. LEGAL ANALYSIS

Plaintiff contends that the ALJ erred in failing to (1) accord controlling or great weight to his treating doctor; (2) adequately assess his mental condition; (3) present appropriate hypothetical questions to the VE; and (4) appropriately assess his credibility.  Within each of these four categories Plaintiff raises additional independent errors as well.  The Undersigned considers each of the errors Plaintiff raises in the following four sections.

**A.    Plaintiff's First Category of Errors: The Treating Physician Rule**

In what he labels as his first statement of error, Plaintiff contends that the ALJ: (1) failed to accord appropriate weight to his treating physicians; (2) calculated an RFC that is not supported by objective medical evidence; and (3) erred in failing to have a medical expert testify at the hearing.

### 1.    Treating Physician Rule

Plaintiff contends that the ALJ erred in rejecting the opinions of his treating physicians. The ALJ must consider all medical opinions that he or she receives in evaluating a claimant's case.  20 C.F.R. § 416.927(d).  The applicable regulations define medical opinions as "statements from physicians . . . that reflect judgments about the nature and severity of your impairment(s), including your symptoms, diagnosis and prognosis, what you can still do despite impairment(s), and your physical or mental restrictions."  20 C.F.R. § 416.927(a)(2).

The ALJ generally must give deference to the opinions of a treating source "since these are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [a patient's] medical impairment(s) and may bring a unique perspective to the medical evidence

that cannot be obtained from the objective medical findings alone . . . ."  20 C.F.R.

§ 416.927(d)(2); *Blakley*, 581 F.3d at 408.  If the treating physician's opinion is "well-supported

by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent

with other substantial evidence in [the claimant's] case record, [the ALJ] will give it controlling

weight."  20 C.F.R. § 404.1527(d)(2).

The ALJ must meet certain procedural requirements if he or she does not afford

controlling weight to a treating physician's opinion.  *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d

541, 544 (6th Cir. 2004).  Specifically, if an ALJ does not afford controlling weight to a treating

source's opinion:

> [A]n ALJ must apply certain factors —namely, the length of the treatment
> relationship and the frequency of examination, the nature and extent of the
> treatment relationship, supportability of the opinion, consistency of the opinion
> with the record as a whole, and the specialization of the treating source—in
> determining what weight to give the opinion.

*Id.*

Furthermore, an ALJ must "always give good reasons in [the ALJ's] notice of

determination or decision for the weight [the ALJ] give[s] your treating source's opinion."  20

C.F.R. § 416.927(d)(2).  Accordingly, the ALJ's reasoning "must be sufficiently specific to make

clear to any subsequent reviewers the weight the adjudicator gave to the treating source's

medical opinion and the reasons for that weight."  *Friend v. Comm'r of Soc. Sec.*, No. 09-3889,

2010 WL 1725066, at *7 (6th Cir. 2010) (internal quotation omitted).  The United States Court

of Appeals for the Sixth Circuit has emphasized the importance of the good-reason requirement:

> "The requirement of reason-giving exists, in part, to let claimants understand the
> disposition of their cases," particularly in situations where a claimant knows that
> his physician has deemed him disabled and therefore "might be especially
> bewildered when told by an administrative bureaucracy that she is not, unless
> some reason for the agency's decision is supplied."  *Snell v. Apfel*, 177 F.3d 128,

13

134 (2d Cir.1999). The requirement also ensures that the ALJ applies the treating physician rule and permits meaningful review of the ALJ's application of the rule. *See Halloran v. Barnhart*, 362 F.3d 28, 32–33 (2d Cir. 2004).

*Wilson*, 378 F.3d at 544–45. Thus, the requirement that the ALJ provide a good reason is "particularly important when the treating physician has diagnosed the claimant as disabled." *Germany-Johnson v. Comm'r of Soc. Sec.*, 312 Fed. A'ppx 771, 777 (6th Cir. 2008) (citing *Rogers*, 486 F.3d at 242).

Finally, the Commissioner reserves the power to decide certain issues, such as a claimant's residual functional capacity. 20 C.F.R. § 404.1527(e). Although the ALJ will consider opinions of treating physicians "on the nature and severity of your impairment(s)," opinions on issues reserved to the Commissioner are generally not entitled to special significance. 20 C.F.R. § 404.1527(e); *Bass v. McMahon*, 499 F.3d 506, 511 (6th Cir. 2007).

Plaintiff maintains that the ALJ erred in failing to accord controlling weight to the opinion of Dr. Banks, the surgeon who performed the cystoprostatectomy to remove Plaintiff's bladder and prostate and other procedures to treat Plaintiff's cancer. Specifically, Plaintiff contends that although "there really are no treating physicians reports, . . . [he] would classify the surgeon and the follow-up from the operation as "treating sources." (Statement of Errors 8, ECF No. 14.) He further posits that "it is very important to give substantial weight to the surgeon that performed the very extensive surgery." *Id.* at 10. Plaintiff does not indicate what specifically the ALJ failed to reference and to what opinions he was purportedly obligated to defer within Dr. Banks' treatment notes that would have altered the RFC analysis.

The Undersigned finds no error in the weight the ALJ accorded to Dr. Banks' opinion. First, Dr. Banks' treatment notes are not inconsistent with the ALJ's RFC analysis. Put

14

another way, Dr. Banks did not report a limitation or restriction that conflicts with the ALJ's determination that Plaintiff can perform light work.  He did not report that Plaintiff is disabled, for example, or that the residual effects of Plaintiff's surgery limit his functional capacity.  Nor did Dr. Banks report that Plaintiff would experience lasting pain from the surgeries, or that his condition would limit his functional capacity in some other way.  Thus, even if the ALJ had accorded Dr. Banks' opinion controlling weight, the record contains nothing to indicate that the outcome would have been different.

Second, Plaintiff failed to demonstrate that Dr. Banks is a treating physician within the meaning of 20 C.F.R. § 404.1502.  A treating physician is one who "has provided medical treatment or evaluation and has had an ongoing treatment relationship with the claimant . . . 'with a frequency consistent with accepted medical practice for the type of treatment and/or evaluation [that is] typical for the [treated condition(s)].'"  *Blakley*, 581 F.3d at 407 (quoting 20 CFR § 404.1502).  As far as the record reveals, Dr. Banks' treatment of Plaintiff was limited to two operations between March and May 2005, and two follow up appointments in June and December of that year.  (R. at 284, 258, 296, 300.)  Plaintiff has provided no authority to support the proposition that treatment of such limited duration and scope is sufficient to qualify Dr. Banks, his surgeon, as a treating source.  (Statement of Errors 7-11, ECF No. 14.)  In the absence of such authority, the Undersigned cannot conclude that Dr. Banks' had an ongoing treatment relationship with the frequency and scope necessary to characterize him as a treating source.[2]

---

[2] Indeed, the relevant case law tends to undercut Plaintiff's position.  *See Daniels v. Comm'r of Soc. Sec.*, 152 Fed. App'x 485 (6th Cir. 2005) (finding that a physician who saw the claimant twice was not a treating physician despite the ALJ referring to the physician as a treating source); *Walker v. Comm'r of Soc. Sec.*, No, 1:08-CV-450, 2009 WL 3126277, at *10 (S.D. Ohio Sept. 23, 2009) (rejecting the plaintiff's argument that his physician who treated him three times is a treating source).

Accordingly, the Undersigned finds no error in the level of weight the ALJ accorded to Dr. Banks' opinions to the extent he even provided them.

### 2.    Calculating the RFC

Also within his first statement of error, Plaintiff argues that the ALJ erred in calculating the RFC. A plaintiff's RFC "is defined as the most a [plaintiff] can still do despite the physical and mental limitations resulting from her impairments." *Poe v. Comm'r of Soc. Sec.*, 342 Fed. App'x 149, 155 (6th Cir. 2009); *see also* 20 C.F.R. §§ 404.1545(a), 416.945(a). The determination of RFC is an issue reserved to the Commissioner. 20 C.F.R. §§ 404.1527(e), 416.927(e). Nevertheless, substantial evidence must support the Commissioner's RFC finding. *Berry v. Astrue*, No. 1:09-CV-000411, 2010 WL 3730983, at *8 (S.D. Ohio June 18, 2010). When considering the medical evidence and calculating the RFC, "'ALJs must not succumb to the temptation to play doctor and make their own independent medical findings.'" *Simpson v. Comm'r of Soc. Sec.*, 344 Fed. App'x 181, 194 (6th Cir. 2009) (quoting *Rohan v. Chater*, 98 F.3d 966, 970 (7th Cir. 1996)); *see also Isaacs v. Astrue*, No. 1:08–CV–00828, 2009 WL 3672060, at *10 (S.D. Ohio Nov. 4, 2009) (holding that an "ALJ may not interpret raw medical data in functional terms") (internal quotations omitted).

An ALJ is required to explain how the evidence supports the limitations that he or she set forth in the claimant's RFC:

> The RFC assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations). In assessing RFC, the adjudicator must discuss the individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis (i.e., 8 hours a day, for 5 days a week, or an equivalent work schedule), and describe the maximum amount of each work-related activity the individual can perform based on the evidence available in the case record. The adjudicator must also explain how any material inconsistencies or ambiguities in the evidence in

the case record were considered and resolved.

S.S.R. 96–8p, 1996 WL 374184, at *6–7 (internal footnote omitted).

Here, Plaintiff argues that substantial medical evidence does not support the ALJ's calculation of the RFC.  Specifically, he contends that Dr. Wosknobnick's report does not support the RFC because that doctor did not offer an opinion as to Plaintiff's physical limitations.  (Statement of Errors 9, ECF No. 14.)  Plaintiff further argues that Dr. Hall's opinion cannot serve as a basis for the RFC because she opined that Plaintiff is capable of performing work at the medium exertional level.  *Id.* at 10.  Plaintiff asserts, "[he is] not completely sure what evidence the ALJ is using to base his RFC on."  *Id.*

The ALJ's calculation of the RFC is supported by substantial evidence.  The ALJ based the RFC on the opinion of Dr. Hall.  (R. at 18.)  Although Plaintiff is correct that Dr. Hall's RFC opinion is less restrictive than the one the ALJ adopted, the ALJ specifically determined that although "[t]he evidence could support a conclusion that the claimant is able to perform work activity at the medium level without difficulty, . . . in extending the benefit of all reasonable doubt, it is determined that the claimant is limited to work activity at the light exertional level." (R. at 19.)  Accordingly, the ALJ's RFC is supported by Dr. Hall's opinion, which constitutes substantial evidence.

### 3.      Presence of a Medical Expert at Hearing

Plaintiff next contends that the ALJ erred in failing to have a medical expert testify at the hearing.  (Statement of Errors 11, ECF No. 14.)  An ALJ is not required to solicit medical expert testimony.  *Walker v. Astrue*, No. 3:11-CV-142, 2012 WL 3187862, at *7 (S.D. Ohio Aug. 3, 2012) (citing *Simpson v. Comm'r of Soc. Sec.*, 344 Fed. App'x 181, 189 (6th Cir. 2009)).

17

Rather, it is within the ALJ's discretion to view the complete record and determined whether a medical expert is necessary. *Id.* (citing *Simpson*, 344 Fed. App'x at 189). Here, Plaintiff failed to develop his argument that the ALJ erred in choosing not to solicit testimony from a medical expert. The entirety of Plaintiff's argument in this regard is as follows:

> I think it would have been very important for a medical expert to be present at the hearing. His testimony could have included the current diagnosis, the prognosis, the residual problems that the Plaintiff would have from this type of extensive surgery and also could probably provide his medical opinion regarding the Plaintiff's ongoing abdominal and lower extremity pain. He could further comment on how frequently the Plaintiff would have to empty his pouch and for how long said procedure would take.

(Statement of Errors 11, ECF No. 14.) Plaintiff provides no authority for this argument. Without a more developed argument articulating a specific need for a medical expert and a reason to conclude that the ALJ abused his discretion in failing to make one available, the Undersigned finds no error in the ALJ's determination that such an expert was unnecessary.

Accordingly, it is **RECOMMENDED** that the errors contained in Plaintiff's first category of error be **OVERRRULED**.

**B.     Plaintiff's Second Category of Error: Severe Mental Impairment**

Although labeled as a failure to properly assess Plaintiff's mental impairment, Plaintiff's next statement of error is actually a challenge to the ALJ's credibility assessment. *See* Statement of Errors 12, ECF No. 14 ("The ALJ went on to claim that he did not feel the Plaintiff's statements regarding his depression were credible."). The crux of Plaintiff's argument is that the ALJ improperly relied on Plaintiff's admitted use of marijuana for medicinal purposes to discount Plaintiff's allegation that he suffers from disabling depression. Because Plaintiff raises credibility as an independent source of error, the Undersigned addresses Plaintiff's argument in

18

the final section of this Report and Recommendation.

For the sake of completeness and in an abundance of caution, the Undersigned will nevertheless evaluate the ALJ's consideration of Plaintiff's depression in his RFC analysis.  The ALJ determined at step two of the sequential evaluation that Plaintiff's depression constitutes a severe impairment.  (R. at 10.)  As discussed above, the question is thus whether substantial evidence supports the ALJ's RFC, including the mental limitations incorporated therein.  *Simpson*, 344 Fed. App'x at 194.  The Undersigned concludes that it does.

The ALJ's RFC incorporates the mental limitations recommended by the mental health professionals that offered opinions in this case.  Dr. Hammerly opined that Plaintiff is moderately impaired in his ability to maintain attention, concentration, persistence and pace.  (R. at 316.)  Dr. Demuth reached the same conclusion, and determined that Plaintiff can nevertheless carry out tasks in situations where duties are static and changes can be explained.  (R. at 328.)  Dr. Demuth further opined that Plaintiff is capable of completing tasks that do not require independent prioritization or more than daily planning.  *Id.*  The ALJ specifically adopted these findings in his analysis.  (R. at 19.)  Although not verbatim, the ALJ built these findings into his RFC assessment.  *See* R. at 19 ("Mentally, the claimant is limited to unskilled work and unable to perform fast paced or high productive tasks.").  Thus, the ALJ's incorporation of mental limitations into the RFC is supported by substantial evidence.

Accordingly, it is **RECOMMENDED** that the errors contained in Plaintiff's second category of errors be **OVERRULED**.

**C.  Plaintiff's Third Category of Errors: Hypotheticals to the VE**

19

Plaintiff raises the following two distinct arguments in his next category of errors: (1) the ALJ erred in failing to include more mental restrictions in his hypothetical questions to the VE; (2) the ALJ erred in determining that Plaintiff's need for breaks does not render him disabled. Neither argument is well-supported or developed.  Nevertheless, the Undersigned considers each argument in turn.

### 1.    Mental Impairment in Hypotheticals

Plaintiff maintains that the ALJ failed to include adequate mental restrictions in his hypotheticals posed to the VE.  Once an ALJ determines that a plaintiff does not have the residual capacity to perform his past relevant work, the burden shifts to the Secretary to demonstrate that Plaintiff possesses the capacity to perform other substantial gainful activity that exists in the relevant economy.  *Varley v. Sec'y of Health & Human Servs.*, 820 F.2d 777, 779 (6th Cir. 1987) (citing *Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d 524, 529 (6th Cir. 1981)).  To meet the burden, the ALJ must make "'a finding supported by substantial evidence that [the plaintiff] has the vocational qualifications to perform specific jobs.'"  *Id.* (quoting *O'Banner v. Sec'y of Health, Educ. & Welfare*, 587 F.2d 321, 323 (6th Cir. 1978)).  Substantial evidence may be produced "though reliance on the testimony of a vocational expert in response to a 'hypothetical' question, but only 'if the question accurately portrays [the plaintiff's] individual physical and mental impairments.'"  *Id.* (quoting *Podedworny v. Harris*, 745 F.2d 210, 218 (3d Cir. 1984)).

The Undersigned concludes that the hypothetical questions the ALJ posed to the VE accurately portrayed Plaintiff's mental impairments.  The ALJ asked the following hypothetical question:

20

Q      Now, if the claimant were limited to light work, and by that I mean he could lift 10 pounds frequently, 20 pounds occasionally, could stand and walk for six hours in an eight hour day and would have the same limitation with regard to needed breaks[, and] he **would be limited to unskilled work, could not do fast paced production type jobs**. Would he be not able to do the medium job he'd done before?

A      He would not be, your honor.  No.

Q      If we had an individual of the claimant's age, education, past work experience and limited to that extent, would there be other work for such an individual?

A      There'd be other light, unskilled work he could do.

Q      What would be examples that would fit?

A      He's in the central Ohio local labor market.  Like a hand packer at the light level: about 2,000 of those locally, 275,000 nationally.  Or a – I think he could do [an] unskilled cleaning job, 5,700 locally, 700,000 nationally.  Packing and filling machine operator: Light unskilled job, 1,000 locally 150,000 nationally.

(R. at 67-68) (emphasis added).  The portion of the testimony that is emphasized above constitutes the ALJ's incorporation of Plaintiff's mental limitations into the hypothetical question.  (R. at 67.)  Although not verbatim, the ALJ's incorporation accurately reflects the mental limitations that the examining and reviewing mental health professionals opined in this case.  (R. at 316, 328.)  The ALJ's RFC assessment also reflects these mental limitations.  (R. at 19.)  Accordingly, the ALJ's hypothetical question accurately portrayed Plaintiff's mental impairments, and the VE's response constitutes substantial evidence to support the ALJ's conclusion that Plaintiff is not disabled within the meaning of the Social Security Act.  *Varley*, 820 F.2d at 779.

     **2.**      **Plaintiff's Need for Breaks**

Plaintiff's next argument essentially challenges the ALJ's determination that he is not disabled despite his need for breaks to self-catheterize.  Plaintiff directs the Court's attention to the VE's testimony that he would be precluded from work if he needed unscheduled breaks to drain his catheter or breaks that would exceed the standard number of breaks provided in a normal workday.[3]  (Statement of Errors 15, ECF No. 14.)  Plaintiff contends that he would need unscheduled breaks to drain his catheter, the timing and duration of which would depend on a variety of factors, and that he is therefore precluded from work.  *Id.*  After a careful review of the record, the Undersigned disagrees.

Plaintiff presented no evidence, medical or otherwise, that would indicate he has a need for unscheduled breaks throughout the workday.  Plaintiff testified at the hearing that he drains his catheter every two to three hours, which takes approximately fifteen minutes.  (R. at 43, 44.)  He did not testify that he is unable to drain the catheter pursuant to a fixed schedule.  Nor did he present medical evidence demonstrating that he is unable to do so.  "The burden lies with the claimant to prove that [he] is disabled."  *Foster v. Halter*, 279 F.3d 348, S.D. Ohio 2001) (citing *Casey v. Sec'y of Health & Human Servs.*, 987 F.2d 1230, 1233 (6th Cir. 1993)).  In fact, Dr. Hall reported that Plaintiff would be able to perform the necessary catheterizations during normal work breaks.  (R. at 336.)  In light of Dr. Hall's report, and in the absence of any evidence to support Plaintiff's contention that he has a need for unscheduled or additional breaks, the Undersigned concludes that substantial evidence supports the ALJ's finding of non-disability.

---

[3] The VE further testified that the need to empty the pouch every two to three hours would not preclude work provided that Plaintiff could empty the pouch during regularly scheduled breaks.  *See* R. at 69 ("[T]ypically, in a standard workday, you'll get a break for fifteen minutes every couple of hours.").

Thus, it is **RECOMMENDED** that the errors contained in Plaintiff's third category of errors be **OVERRULED**.

**D.     Credibility**

Plaintiff next contends that the ALJ failed to properly assess his credibility.  "The ALJ's assessment of credibility is entitled to great weight and deference, since he had the opportunity to observe the witness's demeanor."  *Infantado v. Astrue*, 263 Fed. App'x 469, 475 (6th Cir. 2008) (citing *Walters v.  Comm'r of Soc. Sec.*, 127 F.3d 525, 531 (6th Cir. 1997)); *Sullenger v. Comm'r of Soc. Sec.*, 255 Fed. App'x 988, 995 (6th Cir. 2007) (declining to disturb the ALJ's credibility determination, stating that: "[w]e will not try the case anew, resolve conflicts in the evidence, or decide questions of credibility" (citation omitted)).

Despite the deference courts generally afford to an ALJ's credibility determination, "an ALJ's assessment of a claimant's credibility must be supported by substantial evidence." *Walters*, 127 F.3d at 531.  "Discounting credibility to a certain degree is appropriate where an ALJ finds contradictions among the medical reports, claimant's testimony, and other evidence." *Id.*  Furthermore, in assessing credibility, the ALJ may consider a variety of factors including "the . . . frequency, and intensity of the symptoms; . . . [and] the type, dosage, effectiveness, and side effects of any medication taken to alleviate the symptoms . . . ."  *Rogers*, 486 F.3d at 247.

In making a credibility determination, the ALJ "must consider the record as a whole, including objective medical evidence; the claimant's statements about symptoms; any statements or other information provided by treating or examining physicians and other persons about the conditions and how they affect the claimant; and any other relevant evidence."  *Reynolds v. Comm'r of Soc. Sec.*, 424 Fed. App'x 411, 417 (6th Cir. 2011) (citing SSR 96-7p, 1996 WL

23

374186, at *2 (Jul. 2, 1996)); *see also Rogers*, 486 F.3d at 247 (acknowledging that credibility must be "based on a consideration of the entire record") (internal quotation omitted).  An ALJ's credibility determination is not supported by substantial evidence if he or she fails to consider the record as a whole.  *See, e.g., Martin v. Comm'r Soc. Sec.*, No. 2-cv-71787, 2011 WL 23784469, *1 (E.D. Mich. Sept. 29, 2003) (concluding ALJ's credibility determination was not supported by substantial evidence where he failed to consider medical records that included medical diagnoses of fibromyalgia).

Finally, it is appropriate for an ALJ to consider a claimant's daily activities in determining the credibility of his complaints.  *See Walters*, 127 F.3d at 532 ("An ALJ may also consider household and social activities engaged in by the claimant in evaluating the claimant's assertion of pain or ailments.") (citing *Blacha v. Sec'y of Health & Human Servs.*, 927 F.2d 228, 231 (6th Cir. 1990)).  The United States Court of Appeals for the Sixth Circuit has upheld an ALJ's rejection of a plaintiff's credibility where the plaintiff's activity level is inconsistent with allegations of disabling pain.  *See, e.g., Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 542 (6th Cir. 2007) (upholding a rejection of a plaintiff's credibility where his activities "included washing dishes, light cooking, and doing laundry," as well as shopping, attending church, visiting friends, and going to the mall); *Vance v. Comm'r of Soc. Sec.*, 560 Fed. App'x 801, 805 (6th Cir. 2008) (finding a plaintiff's "activities of daily living [] inconsistent with the level of pain and fatigue alleged" where he admitted "mopping and sweeping three times per month, doing laundry twice a week while carrying laundry baskets with clothes, [and because he] cooks, cleans, does dishes, drives up to one hour without a break, and shops for groceries alone some of the time").

24

Here, the ALJ discounted Plaintiff's credibility as follows:

After careful consideration of the eviden ce, I find that the claim ant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claim ant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment.

The claimant testified to the presence of incapacitating pain, discomfort and other symptoms and alleged associated functional limitations in contrast to the residual functional capacity set forth above. . . . [A ] careful review of the record does not document sufficient objective medical evidence to substantiate the severity of the pain and degree of functional lim itations alleged by the claim ant. The objective evidence fails to dem onstrate the presence of any impairment or combination of impairments that could reasonably be e xpected to result in pain or other symptoms of such a severity or freque ncy as to preclude the range of work assessed herein.

* * * *

There is no evidence of m uscle atrophy or spasm (Exhibit 5F at p. 5). The claimant was neurologically and vascular ly intact at the Decem ber 2008 physical consultative examination, with no m otor, sensory or reflex deficits and full strength and range of motion in all extremities and joints (Exhibit 5F at pp. 2 and 4-7). There is no evidence that the clai mant requires assistive devices such as crutches, splints, braces or a cane, walker or transcutaneous electrical nerve stimulator ("TENS") unit in order to am bulate effectively (Exhibit 5F at p. 2). The claimant demonstrated the ability to heel, toe and tandem walk without difficulty at that time (Exhibit 5F at p. 2). The claimant also demonstrated normal bilateral grasp, pinch, manipulation and fine coordination at that time (Exhibit 5F at p. 4). The claim ant reported in December 2008 that he is able to lift and carry up to 30 pounds at a time (Exhibit 5F at p. 1). The claimant reported in July 2010 that he is able to lift and carry up to 20 pounds at a tim e (Exhibit 16E at p. 3). The evidence in this case supports the determ ination that the claim ant is able to perform work activity at the light exer tional level without difficulty with the physical limitations set forth above.

The evidence also docum ents the claim ant regularly engages in strenuous activities such as wrestling with his gr andson, welding, constructing m odel cars, running with his pet dogs, m owing grass and repairing trucks (Exhibit 4F at p. 5, Exhibit 16E at p. 3 and testim ony). The pursuit and perform ance of such strenuous activities is obviously inconsistent with the claim ant's allegations of disabling pain and other sym ptoms due to his m edically determinable physical impairment and weighs heavily against the overall credibility of such allegations.

25

\* \* \* \*

There is no evidence docum enting that the claimant ever received psychological counseling or [] prescriptions for psychot ropic medication (Exhibit 4F at p. 2 and Exhibit 15E at p. 2). The claim ant testified that he could not always afford to seek medical treatment or afford to obtain prescribed m edication. However, financial problems are not always an adequa te excuse of failure to seek regular medical treatment or follow up (Craig v. Chater , 943 F. Supp. 1184, 1190 (W D Mo., 1996)). There is no evidence in the r ecord that the claimant ever attempted to visit a f ree medical clinic or request ed prescription m edication assistance. Additionally, as discussed m ore fully below, the evidence reflects that the claimant is able to af ford to smoke marijuana on a daily basis (Exhibit 3F at p. 1, Exhibit 5F at pp. 1 and 3 and testim ony). If the claim ant's medically determinable mental impairment and related sym ptoms were as severe as he has alleged, it is reasonable to assum e that he would have found som e way to afford treatment or m edication. The claim ant's alleged financial problem s are not an adequate excuse in this case for his failu re to seek regular m edical treatment or follow-up. The claim ant's failure to seek m edical treatment and obtain prescriptions for psychotropic m edication weighs heavily against his overall credibility in this case.

\* \* \* \*

Additionally, the claim ant's activities of daily living, as described m ore fully above, reflect that the claim ant's level of adaptive functioning is very high and are inconsistent with allegations of disabling symptoms attributable to his medically determinable impairments. Allegations of disabling pain and symptomatology are sim ply not credible a nd, in fact, are absurd in light of the claimant's wide array of activities of daily living.

\* \* \* \*

In addition to the general lack of obj ective evidence to support the claim ant's subjective complaints, there are other considerations that weigh heavily against his overall credibility.

The record indicates that the claim ant may have non-disability related reasons for not working, which weighs further against his overall credibility. The evidence documents a crim inal legal history of an arrest on a charge of dom estic violence (Exhibit 4F at p. 2). However, an in ability to f ind work is not a basis f or disability.

The claimant has also provided inconsis tent statements and other inform ation since applying for disability and disability insurance benefits and Supplem ental Security Income, which weighs heavily against his overall credibility. The

> claimant denied further education beyond high school at the psychological consultative examination in December 2008 (Exhibit 4F at p. 2). However, the claimant reported in July 2010 that he completed trade school in autom otive bodywork (Exhibit 16E at p. 3). The claim ant stated in July 2010 that he is unable to shop in stores due to fears of pouch leakage (Exhibit 16E at p. 4). However, the claimant subsequently testified that he does shop in stores.
>
> Although the inconsistent statem ents and other inform ation provided by the claimant may not be the result of a conscious intention to m islead, nevertheless, such statements suggest that the inform ation provided by the claim ant generally may not be entirely credible, honest and reliable.

(R. at 16-20.)

Plaintiff contends that the ALJ erred in discounting his credibility. He posits that although he "has not had the ability to continue follow-up care," the evidence in the record "is very consistent with the fact that he continues to suffer from abdominal pain." (Statement of Errors 17, ECF No. 14.) Plaintiff further contends that the ALJ was "overly obsessed" with Plaintiff's admitted use of marijuana for pain management. *Id.* Plaintiff posits that his marijuana use should not detract from his credibility because many states allow the use of marijuana for medicinal purposes, and because he was open and honest about his marijuana use. *Id.* at 17-18. Finally, Plaintiff contends that the ALJ erred in failing to consider his consistent work-history from 1976 through 2008, which he contends supports his credibility. *Id.* at 18.

The Undersigned declines to disturb the ALJ's credibility determination. First, substantial evidence supports the ALJ's determination that there is a lack of objective medical evidence to support Plaintiff's allegations of disabling pain and depression. As set forth above, the ALJ conducted a thorough analysis in this regard. (R. at 16-20.) With respect to Plaintiff's complaints of pain, the limited medical evidence in the record demonstrates normal findings on examination. (R. at 319-25.) Moreover, despite his conclusory assertion that the medical

27

records support his allegations of continued abdominal pain, Plaintiff points to nothing in the record that would substantiate this claim. (Statement of Errors 17, ECF No. 14.) The record likewise lacks objective medical evidence indicating that Plaintiff suffers disabling depression. The mental health professionals who examined Plaintiff or reviewed his records opined that he is capable of performing some level of work. (R. at 317, 328, 339.) Nothing in the record indicates that Plaintiff's depression renders him totally disabled.

Substantial evidence also supports the ALJ's stated reasons for discounting Plaintiff's credibility. The ALJ appropriately considered Plaintiff's daily activities in assessing his credibility. *Walters*, 127 F.3d at 532. The record reveals that Plaintiff wrestles with his grandson, welds, builds model cars, runs with his dogs, mows the grass, repairs trucks, visits with his family, takes his grandson to and from school each day, goes shopping, reads, drives, and enjoys sitting outside on the porch watching the neighborhood children play. (R. at 33, 40, 45-49, 315.) As the ALJ indicated, these activities are inconsistent with Plaintiff's allegations of disabling pain and depression. (R. at 16.) Moreover, the ALJ appropriately discounted Plaintiff's credibility based on his inconsistent statements regarding his education and ability to go shopping. *Swain v. Comm'r of Soc. Sec.*, 379 Fed. App'x 512, 516 (6th Cir. 2010) (upholding an ALJ's rejection of a plaintiff's credibility based on inconsistent statements).

The Undersigned finds Plaintiff's remaining arguments unavailing. There is no indication in the record that the ALJ was "overly obsessed" with Plaintiff's admitted use of marijuana. Indeed, Plaintiff fails to point to anything in the ALJ's extensive decision that supports his contention. Although the ALJ referenced Plaintiff's marijuana use in other contexts, he did not specifically use it as a basis upon which to discount Plaintiff's credibility.

28

(R. at 16-20.)  Additionally, the ALJ's failure to explicitly recognize Plaintiff's extensive work history does not constitute reversible error.  As stated above, the ALJ's credibility determination will be upheld if it supported by substantial evidence.  *Mullen*, 800 F.2d at 545.  The substantial evidence standard reflects a "zone of choice within which the decision makers can go either way, without interference by the courts."  *Id*.  Substantial evidence, as set forth above, supports the ALJ's credibility determination in this case.

Accordingly, it is **RECOMMENDED** that Plaintiff's final statements of error be **OVERRULED**.

## VII. CONCLUSION

In sum, from a review of the record as a whole, the Undersigned concludes that substantial evidence supports the ALJ's decision denying benefits.  Accordingly, it is **RECOMMENDED** that the Court **OVERRULE** Plaintiff's Statement of Errors and **AFFIRM** the Commissioner of Social Security's decision.

## VIII. PROCEDURE ON OBJECTIONS

If any party seeks review by the District Judge of this Report and Recommendation, that party may, within fourteen (14) days, file and serve on all parties objections to the Report and Recommendation, specifically designating this Report and Recommendation, and the part in question, as well as the basis for objection.  28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b).  Response to objections must be filed within fourteen (14) days after being served with a copy. Fed. R. Civ. P. 72(b).

The parties are specifically advised that the failure to object to the Report and Recommendation will result in a waiver of the right to *de novo* review by the District Judge and

waiver of the right to appeal the judgment of the District Court. *See, e.g.*, *Pfahler v. Nat'l Latex Prod. Co.*, 517 F.3d 816, 829 (6th Cir. 2007) (holding that "failure to object to the magistrate judge's recommendations constituted a waiver of [the defendant's] ability to appeal the district court's ruling"); *United States v. Sullivan*, 431 F.3d 976, 984 (6th Cir. 2005) (holding that defendant waived appeal of district court's denial of pretrial motion by failing to timely object to magistrate judge's report and recommendation). Even when timely objections are filed, appellate review of issues not raised in those objections is waived. *Robert v. Tesson*, 507 F.3d 981, 994 (6th Cir. 2007) ("[A] general objection to a magistrate judge's report, which fails to specify the issues of contention, does not suffice to preserve an issue for appeal . . . .") (citation omitted)).

Date: February 19, 2013                    /s/ *Elizabeth A. Preston Deavers*
                                      Elizabeth A. Preston Deavers
                   United                            States Magistrate Judge

30